**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
|     Plaintiff, ) | |
| ) | No. CR 15-938-TUC-CKJ |
| vs. ) | **ORDER** |
| ) | |
| Jesus H. Morales-Armenta, ) | |
|     Defendant. ) | |

Pending before the Court are the discovery issues regarding I-19 checkpoint statistics, canine statistics (and/or raw data) and canine training records.

Evidence and argument were presented to the Court on October 25, 2016, in a joint evidentiary hearing with CR 16-121-TUC-CKJ. As the briefs in the cases differ, the Court accepts any arguments made on behalf of one defendant as applying to both defendants.

I. *Factual and Procedural History*

On April 20, 2015, Jesus H. Morales-Armenta ("Morales-Armenta") arrived at the Border Patrol checkpoint on I-19 near Tubac, Arizona, as the registered owner, driver, and sole occupant of a 2007 Hyundai Sonata. Doenja, a Border Patrol canine patrolling the pre-primary area, alerted to the vehicle and the Morales-Armenta was immediately directed to park in the secondary inspection area. An x-ray of the Sonata revealed an anomaly in the rear quarter panel, above the passenger side tire. A search of that area revealed 10 bundles, containing 12.2 kilograms of cocaine.

On May 20, 2015, Morales-Armenta was indicted for Conspiracy to Possess with

Intent to Distribute Cocaine and Possession with Intent to Distribute Cocaine

On April 4, 2016, Morales-Armenta filed a Motion to Suppress (Doc. 50). A response (Doc. 60) and a reply (Doc. 69) have been filed.

On that same date, Morales-Armenta filed a Request for Disclosure (Doc. 51). A response (Doc. 61) and a reply (Doc. 63) have been filed. A protective order was issued as to confidentiality of law enforcement sensitive information, specifically, records related to U.S. Border Patrol canine Doenja. (*See* Doc. 39).

On July 12, 2016, Morales-Armenta filed a Motion to Compel Disclosure (Doc. 79). A response (Doc. 84) has been filed.

The magistrate judge heard argument regarding the Request for Disclosure (Doc. 51) and the Motion to Compel Disclosure (Doc. 79) on July 29, 2016. Defense counsel agreed with the magistrate judge's proposed bifurcation of disclosure issues. The magistrate judge took the issues under advisement.

Morales-Armenta filed a Supplement to Motion to Compel Disclosure/Motion to Reconsider (Doc. 90). Morales-Armenta withdrew his consent to the bifurcation of the disclosure issues.

On August 11, 2016, the magistrate judge issued an Order granting in part and denying in part the Request for Disclosure and the Motion to Compel Disclosure (Doc. 91). The magistrate judge ordered the government to submit the canine training records to the court for an *in camera* review and ordered the government to provide an affidavit from the Chief Counsel's Office detailing the existence of the checkpoint data.

On August 18, 2016. the government filed a Motion for Review of Magistrate Judge's Order Requiring Proof of "Primary Purpose" of I-19 Checkpoint (Doc. 93). A response (Doc. 103) and a reply (Doc. 118) have been filed.

On August 26, 2016, the magistrate judge ordered the government to disclose some of the canine training records in an unredacted format (Doc. 98).

On August 31, 2016, the magistrate judge vacated the hearing regarding the Motion to Suppress pending resolution of the issues before the District Judge (Doc. 104).

1    On September 1, 2016, the government filed an Appeal of Magistrate Judge's Order
2    to Produce Documents to Defense (Doc. 107) as to August 26, 2016, order (Doc. 98) of the
3    Magistrate Judge.  The government also filed two Supplements (Doc. 108 and 115).  A
4    response (Doc. 117) has been filed.

5    In the interest of judicial economy and pursuant to LRCrim 5.2 and LRCiv 42.1(e)(2),
6    the matter was reassigned to this Court on September 19, 2016 (Doc. 122).

7    On September 19, 2016, this Court, *inter alia*, set argument on the Appeals, afforded
8    the parties an opportunity to file supplemental briefs, and terminated the referral to the
9    magistrate judge of the discovery issues related to the checkpoint and canine issues (Doc.
10   122).

11   The Court has received and reviewed the unredacted and redacted canine records
12   submitted for an *in camera* review in CR 15-938-TUC-CKJ.  These records include the
13   declarations of Matthew B. Devaney ("Devaney"), Paul E. DuBois ("Dubois"), and Damien
14   E. Montes ("Montes").  A supplemental Declaration (Doc. 115-2) by Devaney has been
15   submitted and reviewed by the Court.

16   During an October 5, 2016, status conference, this Court stated it would conduct a *de*
17   *novo* review of the disclosure issues and hear all motions in this case (Doc. 128).

18   A joint evidentiary hearing with CR 16-121-TUC-CKJ on disclosure issues was held
19   on October 25, 2016.  At the conclusion of the hearing, the Court took the disclosure issues
20   under advisement (Doc. 137).

21

22   II.  *October 25, 2016, Hearing*

23   The government advised the Court it does not object to disclosure of Exhibits 1-5, 15,
24   29, 31, and 32 of the canine records submitted for *in camera* review, as stated in the affidavit
25   of Matthew Delaney (CR 15-938-TUC-CKJ, Doc. 115-2).   Defense counsel advised the
26   Court that the canine records submitted in this case is intended to apply to CR 16-121-TUC-
27   CKJ as well.  Exhibits 1-5 were admitted during the hearing.  The Court will direct exhibits
28   1-4 be docketed with this Order.

A. *Summary of Testimony of U.S.B.P. Division Chief Raleigh L. Leonard*

Raleigh L. Leonard, Division Chief, Law Enforcement Programs, U.S. Border Patrol, Tucson Sector ("Leonard"), testified the Nogales station area of responsibility includes approximately 30.3 linear miles of international border between the United States and Mexico and encompasses four border zones and two northern zones. *See* Ex. 5.

In the Tucson Sector, there are eleven checkpoints, located on every major route of egress away from the border. Checkpoints are typically located in areas that have high levels of activity along the border (border crossings, illicit activity), are safe for the motoring public (in coordination with the Arizona Department of Transportation), not located directly adjacent to densely populated areas, not in close proximity to the border, and do not constitute a major egress leading away from the border. Additionally, pursuant to federal regulations, checkpoints may be as far as 100 air miles from an international border.

The use of checkpoints is a safer alternative than roving patrols.

The primary focus of the checkpoints is the enforcement of immigration laws and to have everybody who passes through the checkpoints state their citizenship. Many thousands of immigration status determinations occur in the Tucson Sector, which result in a very small number of immigration violations; an even smaller number of narcotics violations; and even fewer other violations.

The busiest checkpoint in the Tucson Sector is the I-19 checkpoint located approximately 25 miles north of Nogales. According to statistical analysis completed by the Arizona Department of Transportation, over 18,000 vehicles went through the checkpoint in 2015 and over 17,000 vehicles went through the checkpoint in 2014. The checkpoint is strategically located in the center of a valley; although it can be walked around, it is a challenge to drive around.[1] An integrated fixed tower located adjacent to the I-19 checkpoint detects a tremendous amount of traffic of people attempting to circumvent the checkpoints.

---

[1]The I-19 checkpoints was located further south prior to 2006. Based on population growth and security risks (e.g., nearby school), a strategic location further north is now being used.

The area also includes sensors and agents on patrol in ATVs, horse patrol, or on foot.

Signs around the checkpoints alert people approaching the checkpoint to slow down and that it is a Border Patrol checkpoint. It is a clearly marked location where vehicles are asked to stop and then continue north away from the U.S.-Mexico border. A large canopy at the checkpoint covers most of the three lanes at the checkpoint (other than for major holiday weekends or because of the flow of traffic, typically only two lanes are in operation). A housing unit allows agents to monitor traffic and support the agent who is in primary. By primary, Leonard refers to a Border Patrol agent standing in the open, between the lanes with a stop sign next to him. As vehicles pull up to him, the agent conducts his immigration status determination of the vehicle. The I-19 checkpoint is open 24 hours a day, seven days a week, 365 days a year. Although some checkpoints may shut down because of inclement weather, the I-19 checkpoint never shuts down.

There are 5,000 points where someone who was interested in entering the United States unlawfully can use some sort of terrain feature to effect an unlawful entry into the United States.[2] The Nogales station area of responsibility ("AOR") is heavily trafficked by undocumented migrants who are attempting to circumvent Border Patrol resources.

Approximately 24 canines are currently assigned to the Nogales Border Patrol station. The canines are divided up amongst the various shifts to make try to ensure there is always a detection canine on duty at the I-19 checkpoint. However, the canines are not always on duty due to getting over-heated, being injured or being sick. The availability of canines may also be affected by their be used for tracking or trailing if a tactical request is made from the field.

As vehicles pull into a checkpoint, a canine handler and a leashed canine are located just ahead of the agent standing in primary. At the I-19 checkpoint, this means the canine is directly south of the agent at the stop sign. The canine handler and the canine walk around

---

[2]It appears the testimony was referring to unlawful entry points within focus area 1, which includes the Nogales station.

the traffic that is approaching the primary immigration checkpoint.  Leonard refers to this area as pre-primary.  The canine handler does not interact with the occupants of vehicles, but is looking at and interacting with his canine.  If a canine alerts, the canine handler notifies the agent at primary.  The agent at primary will refer the vehicle to secondary.

The agents at primary always ask questions related to immigration status.  A check is done of every occupant of every vehicle.[3]  These questions are asked regardless of whether a canine has alerted to a vehicle.

Leonard testified as to the statistics summarized in the government's exhibits.  The statistics were prepared by the Washington, D.C., headquarters office of Border Patrol.  The headquarter analysis relied upon classification of the reports/events by individual agents.  Prior to being notified by headquarters that it would compile the data, local agents had begun a report by report analysis; Leonard does not recall if the local analysis was ever completed.  As far as Leonard knows, the data system used by headquarters cannot clarify which or how many canine alerts related to humans or narcotics, but that data is contained in the narrative portions of agents' reports.   The statistics from headquarters include activity that occurred at the Arivaca and I-19 checkpoints.

Referencing the exhibits, Leonard testified regarding the number and the types of arrests at the I-19 checkpoints.  There were a total of 242 arrests (from 128 events, which generally is a vehicle from which an arrest is made, but can include a bicycle or a single person on a shuttle) from October 21, 2014, through April 20, 2015 at the I-19 checkpoint.  This includes all arrests whether they pertained to immigration or not.  Of those totals, there were 72 immigration related events that resulted in the arrest of 181 persons.[4]  These persons

---

[3]Referring to a delivery man who goes through the checkpoint every day, a doctor who lives nearby, and the mayor of Tubac, Leonard clarifies that agents may tell a local resident traversing through the I-19 checkpoint to just go through the checkpoint.  He also clarifies that, when a canine has alerted to a vehicle, in some situations the agent at primary may just direct the vehicle to secondary without questioning the driver as to immigration status.

[4]Leonard clarified the criteria for this category of the statistics means there would be an administrative or criminal alien smuggling case.  Specifically:

1   need not be illegal immigrants, but are related to an immigration offense.  Leonard initially

2   testified that illegal immigrants who are arrested for narcotics offenses are not included in

3   the immigration related totals, but later stated they are defined under both headings.  During

4   the same time period, there were 65 narcotic related arrests (out of 55 narcotic related

5   events).  18 of those arrestees were not United States citizens.[5]  During that same time period

6   there were 61 non-immigration related arrests.  This includes narcotics related arrests.  This

7   number is lower than the narcotics related number because some of the 65 narcotics related

8   arrests involved some persons not in violation of immigration laws.  The persons referred to

9   are 14 years of age or older.[6]

10   Statistics from the nearby area zones show the activity that occurs at the checkpoint

11   is similar, but with less immigration related events compared to narcotics related events in

12   those other areas.

13

14   B.  *Summary of Testimony of U.S.B.P. Supervisory Agent Alex Markle*

15   Border Patrol Supervisory Agent Alex Markle ("Markle") testified that his duties

16   include  selecting  and testing canines for purchase by Customs and Border Protection

17   ("CBP"), training new canine handlers, training canines, developing curriculum for the use

18   and training of new canine handlers, training  instructors within the canine program of CBP

19

20   *Immigration Related include events with at least one of the following criteria:
        - Incident type of AAS or CAS

21      - Includes a deportable alien

22      - Includes a subject presented for prosecution on an 8 USC 1324 charge

23   Exs. 3 and 4.

24   [5]The testimony did not clarify if this included both illegal aliens and Lawfully Authorized Permanent Residents ("LAPR").

25

26   [6]Leonard testified as to the statistics in Ex. 3.  Ex. 4 indicates there were 582 total arrests (arising from 318 total events) at the I-19 checkpoint from June 15, 2015 – June 14, 2016.  Of

27   those totals, there were 184 immigration related events that resulted in 457 immigration related arrests.  During the same time period, there were 121 narcotic related arrests (out of 113 narcotic

28   related events).  25 of those arrestees were not United States citizens.

and other related duties.  Markle adopted the affidavits submitted by Devaney.

The curriculum includes the training of the handlers during classroom setting (e.g., legal instruction, mock scenarios), the field instruction and rating of canine handlers during the field instruction, and certification testing of the canine handlers and canines.

The selection of canines comes with a 180 day health guarantee as well as a 15 day return policy should the canine have any problems or if unforeseen issues arise.  The canines are put through a series of exercises designed to show what the canine is capable of and desires to do.  The canines are evaluated on temperament, reaction, and physical capability. Because CBP encompasses every possible geographic area and environments in the United States, canines have to be suitable for all possible environments for use in deployment.

As related to immigration offenses, canines are used for the primary purpose of detecting concealed humans.  Border Patrol utilizes physical apprehension canines, search and rescue canines, and concealed human and narcotic detection canines.  Detection canines are trained to detect the odors of marijuana, heroin, cocaine, methamphetamine, ecstasy and concealed humans.

Typically during every two-week period throughout the entire year a handler and canine receives eight hours of documented training.  The ongoing training is designed to be a challenge for the canine team and is meant to improve their performance overall.

The quarterly training records, because of the scores having been averaged, make it obvious if additional training is needed.  A certification is an evaluation because it is the overall evaluation of a canine team and it certifies that a canine team has passed the certification training.  A canine team is certified for one year.

As a team, a canine handler and the canine pass or fail.  If they fail certification they receive 40 hours of remedial training and then are tested via certification again; if they fail that certification testing, the team is then separated upon approval by the director of the CBP canine program.  Of the two, the canine handler is the most likely to fail – 90 % of the time the problems can be resolved by removing the handler.

Markle testified as to some of the exercises utilized during the yearly certification,

consisting of vehicles, warehouses, occupied buildings, open area searches, livestock environments, and luggage and parcel searches.

Regarding the redacted records submitted to the Court for an *in camera* review, Markle testified that specific portions of the training program are redacted because of concerns of reverse engineering, testing of contraband and human concealment methods, or other attempts to defeat law enforcement efforts by people who are smuggling people or contraband into the United States. The concern is not only what is contained in the documents, but what knowledge comes with it – in other words, once that knowledge is acquired, it cannot be forgotten. Further, that knowledge can be transferred to other arenas (e.g., chemical munitions).

Markle states that, with the proposed redactions, the reliability of a canine can be evaluated by examining the entire program and processes, without going into the specifics.

Markle believes SWIG is an acronym for the scientific working group (researchers and practitioners) of detection and original graphic detection dogs. This panel has put together some best practices for various aspects of detection – canines as well as other disciplines regarding canines. This panel recommend a single blind and odor range of motion for purposes of certification testing.

Canines are trained to detect concealed humans in the same manner by which disaster canines are trained. The canines are also trained to ignore visible humans.

Border Patrol has a huge swath of land to cover, and canines are used throughout the entire Southern Arizona Border Patrol area of operation. Canines are used in the desert and at the ports of entry in support of field operations. Canines are used to locate, for example, narcotics that are discarded in the desert when a person has absconded. It is an efficient use of resources to train the canine for both concealed human and narcotics detection. All canines that search for narcotics also search for concealed humans. CBP canines are also trained for other detections – e.g., currency and firearms. Since Customs and Border Patrol merged into CBO in 2010, all of their canines are trained the same.

Markle is aware of case law establishing the defense has a right to receive

documentation regard the K-9 and the canine handler's ability in order to effectively cross-examination the handler.  The unredacted documents inform the defense of the training for imprinting, searching, and indicating, but the details of how it is done is not provided. The lack of the defense knowledge of the details does not hinder cross-examination because a canine handler does not know of the process and it does not show the reliability of a canine in the field.  Markle is not aware of the curriculum having ever been released in unredacted form.

An alert is the canine's subconscious change of body posture and increased respiration when the canine encounters the odors it has been trained to recognize.  A canine is trained, after an alert, to give a passive indication (e.g., sit, point) pinpointing the strongest source of that odor.

The CBP canines are not "dual-trained."  Dual-trained means a canine is, for example, a detection canine and a physical apprehension canine.  The CBP has solely detection canines.

Other persons/entities other than CBP train and use canines.  The CBP canine training program is comprehensive and is continually reevaluated.  The CBP canine training program has been evaluated by both a government agency and a non-government entity.

C.  *Summary of Testimony of Expert Lawrence Joseph Myers, Ph.D.*

Lawrence Joseph Myers, Ph.D. ("Dr. Myers"), has an educational background in veterinary medicine, neurophysiology, and sensory function and behavior.[7]  He first started studying canines and canine training in 1982 and has continued to do so until the present.

_____

[7]Dr. Myers' curriculum vitae indicates he has worked at Auburn University as an Assistant Professor and an Associate Professor for the Department of Physiology and Pharmacology and a Director for the Institute for Biological Detection Systems at different times since 1982.  He has received numerous honors and awards; has served on multiple panels and board memberships, has made many presentations, and has participated in several peer reviews; the majority of these activities were related to canine detection.  Dr. Myers has also published numerous book chapters, articles, and abstracts as well as having completed over 40 government reports and data compilations.  *See* Exs. 31 and 33.

Over the years, Dr. Myers has become familiar with Border Patrol's training and certification programs for detection canines. He has reviewed and made recommendations for canine training program curricula, including detection for explosives, for other government agencies. He has occasionally acted as a troubleshooter and consultant working alongside canine handlers/instructors for other government agencies. In 1992, he was asked to and did give a short course on various aspects of detector dogs in El Paso, Texas. However, that information is not included in his curriculum vitae. Dr. Myers testified his curriculum vitae was complete through 2008, but after 2008 it has not been completely updated.

Other than the 1992 course, Dr. Myers testified he has never worked for or worked in any capacity as an instructor in a canine training program and has never worked as a canine handler.

Dr. Myers stated that because of the substantial redactions of the canine records, he is unable to tell to what training modules or subsections the materials are referencing. He is unable to get enough information about the CBP detection canine training and certification program to develop opinions about whether it was appropriately developed or not. He was not able to develop an opinion because critical information that he would normally try to examine is redacted. It would be helpful to Dr. Myers if the documents were not redacted. Should he be provided with the unredacted material, Dr. Myers does not foresee a way that his receipt of the documentation could result in someone from a drug cartel reverse engineering the Border Patrol canine training and certification program such that they could learn how to avoid being detected.

Dr. Myers opined that the current redacted status of the documents does not allow him to advise defense counsel in a way that would help him prepare to cross-examine government witnesses on the subject. He clarified that the evaluation methodology is also redacted. Although he has a document with numbers in various categories, he has no way to form an opinion of the meaning or validity of the numbers. Dr. Myers stated that the labeling of each section is not redacted, just specific redactions within each category; he can see the

categories for evaluation for both the canine handler and the canine. A review of the table of contents does not provide Dr. Myers a basis to determine if the CBP canine training and certification program is appropriate. The application of a methodology is different than the theory of a methodology.

For canine training, there needs to be a minimum of single blind, but preferably with double blind. For canine certification, double blind is required. However, only a couple of agencies or groups require double blind certification; the SWIG working panel recommends double blind as a best practice.[8] As an analogy, evaluating an educational transcript, without looking at the specific curriculum, does not provide an adequate evaluation.

Dr. Myers has been involved in canine cases in which he has received more unredacted records than those provided to him in this case. Although redaction is not normally allowed, the Federal Bureau of Investigation certification records are an exception.

III. *Requested Disclosure as to Constitutionality of Checkpoint and Canines*

A. *Morales-Armenta's Request*

Morales-Armenta requests the Court order disclosure of:

Statistics from the immigration checkpoint on I-19 north of Nogales that show:

a) how many canine alerts were made for the 12-month bracketing the incident date in this case. ie the period six months prior to and six months following April 20, 2015;

b) how many of these canine alerts resulted in the seizure of "concealed humans" and how many resulted in the seizure of drugs;

c) how many of these canine alerts revealed no contraband at all.

Motion to Compel Disclosure (Doc. 51), pp. 1-2.

Morales-Armenta asserts the information is germane to the issues raised in his Motion to Suppress. Further, Morales-Armenta asserts that, not only is the information discoverable pursuant to Fed.R.Crim.P. 16., it is also information that should be available for the Court to determine whether the government has sustained its burden of proving that the purpose of

---

[8]A SWIG dog is a scientific working dog.

the canine at the checkpoint is immigration-related and not for narcotics-interdiction.

Morales-Armenta also asserts the United States Border Patrol is the only entity that has all of the data regarding searches and arrests at the checkpoint. Indeed, Morales-Armenta asserts the actual numbers of what was occurring at a given checkpoint were more or less dispositive of the case in *United States v. Soto-Camacho*, 58 F. 3d 408 (9th Cir. 1995). Therefore, he asks: "[W]]hy was the government so readily able to provide the numbers in Soto-Camacho, at a time when computers and computer data were more cumbersome to deal with than they are today, but is hamstrung by unknown and undefined difficulties in 2016?" Motion to Compel Disclosure (CR 16-121-TUC-CKJ, Doc. 39), p. 3. Indeed, Morales-Armenta asserts it should not be so difficult to review the reports (from the I-19 checkpoint taken in the normal course of business for the time periods) to sort them into the requested categories. Alternatively, Morales-Armenta would not object to the disclosure of the raw data.

B. *Relevant Issues to Be Reviewed for the Motion to Suppress*

The issues raised in the Motion to Suppress are the constitutionality of the checkpoint, the use of the canines at the checkpoint, and the reliability of the canines.[9] The Supreme Court has determined that the government's legitimate interests advanced by a temporary seizure outweigh the minimal intrusion on a motorist's privacy. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62 (1976). In balancing these interests during a checkpoint stop, the Court considered: (1) whether the checkpoint procedures were routinely and evenly applied to all vehicles; (2) whether the checkpoint involved little agent discretion and was not likely to result in abuse; and, (3) whether the appearance of authority of the agents at the checkpoint would allay the concerns of lawful travelers. Id. at 556-60.

In *Soto-Camacho*, the court stated:

Except for the potential influence of drug intelligence on the decision of when within

---

[9]The reliability of the canines will be discussed in section IV.

the month to activate it, the Jacumba Checkpoint does not differ in any material respect from the temporary checkpoint at Camp Pendleton that we condoned in *Hernandez*.  Its primary purpose is to check for aliens, all vehicles are stopped, the checkpoint is well identified, Border Patrol agents exercise no discretion over the checkpoint's operation, and the stop itself involves a minimal intrusion.

58 F.3d at 411 (footnote omitted).  In *Soto-Camacho*, the checkpoint was operational for about ten days out of each month, with "historical data reflecting trends of alien entries, alien smuggling, narcotics smuggling, and an evaluation of the peak periods of these trends" and "harvest seasons[,]" *id*. at 410, included as  factors used to determine when the checkpoint would be operational.  The historical data referred to included that "a large percentage of checkpoint narcotic seizures involve alien principals (during the period from January 21, 1992 through April 24, 1994, 76% of the narcotic seizures at the Jacumba Checkpoint involved alien principals)" and that:

> Between January 21, 1992 and April 24, 1994, Border Patrol agents at the Jacumba Checkpoint made at least 322 separate illegal alien seizures and apprehended 1,544 illegal aliens.  During the same period, there were 68 seizures of controlled substances discovered in vehicles and 87 persons were arrested as a result.

*Id*. at 410-11.  The government also points out that, after discussing *United States v. Watson*, 678 F.2d 765, 769 (9th Cir.), cert. denied, 459 U.S. 1038, 103 (1982), *Soto-Camacho* found the stop and search of Soto-Camaco had an "independent administrative justification," and "did not exceed in scope what was permissible under that administrative justification." *Soto-Camacho*, 53 F.3d at 412, (citing *Watson*, 678 F.2d at 771).  Thus, the immigration checkpoint was "not infected" by the fact that Border Patrol based the timing of the operation of the checkpoint in part on drug intelligence.  *Id*.

C.  *Relevant Statistics Provided by the Government*

In this case, the evidence establishes the I-19 checkpoint is operational 24 hours a day, 365 days a year.  Efforts are made to ensure a canine is always there, but one is sometimes not available.  In other words, an initial review indicates the historical data reflecting trends is not considered in determining when the checkpoint is operational.  Nonetheless, that does not mean the statistics and/or the canine information requested by Morales-Armenta may not

be relevant in determining the issues raised by Morales-Armenta.

The testimony and exhibits presented at the hearing establish information comparable to that considered in *Soto-Camacho* has now been disclosed.  During a one year period around the arrest of Morales-Armenta there were a total of 532 (242 + 290) arrests.  Of these arrests, 411 (181 + 230) of the arrests were immigration related and 121 (65 + 56) of them were narcotics related.  34 (18 + 16) of the narcotics related arrests involved non-United States citizens; these narcotics arrests are also included in the immigration arrests if they involved a deportable alien.  This means there were approximately 87 (121-34) United States citizen narcotics related arrests.[10]  Additionally, there were a total of 121 (61 + 60) non-immigration arrests (this includes narcotics events and other crime events).  During the same period, there were a total of 277 (126 + 151) events – 161 (72 + 89) of them were immigration related and 102 (55 + 47) of them were narcotics related, with 27 (15 + 12) of the narcotics related events involving non-United States citizens.  *See* Ex. 3.

This means, at the I-19 checkpoint from October 21, 2014, through October 21, 2015, 77.3% of the arrests were immigration related, 70.9 % of the arrests were only immigration related arrests (not including any overlap with narcotics related arrests)[11], and 22.7 % of the arrests were non-immigration related.  The narcotics related arrests involving United States citizens (i.e., not immigration related at all), constituted 16.4% of the total arrests.  Additionally, 58.1 % of the events were immigration related and 36.8 % of the events were narcotics related (this includes some overlap with deportable aliens).

Statistics from the nearby area zones show the activity that occurs at the I-19 checkpoint is similar, but with less immigration related events compared to narcotics related events in those other areas.  *See* Ex. 3.  For example, during the same time period, 91.4 % of

---

[10]"Approximately" was used because the testimony did not establish that non-United States citizens were necessarily deportable aliens.

[11]To calculate this percentage, the Court reduced the number of immigration related arrests (411) by the number of narcotics related non-USC arrests (34).  The remaining 377 arrests constitutes 70.9% of the total arrests.

1  the arrests in zones 38 and 47 were immigration related and 98.4 % of the arrests in zone 19

2  were immigration related.  *See* Exs. 1-3.

3

4  D.  *Materiality*

5  "To obtain discovery under [Fed.R.Crim.P. 16], a defendant must make a prima facie

6  showing of materiality."  *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)

7  (citing *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).  Evidence is material

8  under Rule 16 if it is "relevant to the development of a possible defense," *Mandel*, 914 F.2d

9  at 1219 (citation and internal quotations omitted), or if it will "enable the accused to

10 substantially alter the quantum of proof in his favor," *United States v. Marshall*, 532 F.2d

11 1279, 1285 (9th Cir. 1976); *see also United States v. Hernandez-Meza,* 720 F.3d 760, 768

12 (9th Cir. 2013) (the low threshold of materiality is satisfied if the information would have

13 helped to prepare a defense); *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995)

14 ("threshhold showing of materiality requires a presentation of 'facts which would tend to

15 show that the Government is in possession of information helpful to the defense") (citing

16 *Mandel*, 914 F.2d at 1219).

17 Courts have distinguished between evidence that is exculpatory, and thus discoverable

18 under *Brady v. Maryland*, 373 U.S. 83 (1963), and evidence that is material and, therefore,

19 discoverable under Fed.R.Crim.P. 16.  *See e.g., United States v. Messerlian*, 832 F.2d 778,

20 795 (3rd Cir. 1987) ("under Rule 16(a)(1)(D), the information that the government must

21 disclose need not be exculpatory; it merely must be material to the preparation of the

22 defense"); *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) ("*Brady* is not a

23 discovery rule, but a rule of fairness and minimum prosecutorial obligation"); *United States*

24 *v. Kaplan*, 554 F.2d 577, 579-80 (3rd Cir. 1977) ("where documentary evidence is

25 exculpatory, it may be within both Brady and Rule 16, but nonexculpatory records are

26 obtainable in advance of trial only by virtue of Rule 16").

27 Additionally, evidence that would impeach a central prosecution witness is

28 indisputably favorable to the accused.  *United States v. Price*, 566 F.3d 900 (9th Cir. 2009);

1   *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974) (in general, the Sixth Amendment right

2   of confrontation permits a defendant to cross-examine witnesses in order to test the

3   believability of the witness).  Lastly, some district courts have determined that the question

4   is whether "evidence is favorable to the defense or likely to lead to the discovery of favorable

5   evidence."  *United States v. Moore*, 867 F. Supp. 2d 150, 151 (D.D.C. 2012) (emphasis

6   added); *United States v. Sudikoff*, 36 F.Supp.2d 1196, 1198–99 (C.D.Cal. 1999).

7   Additionally, a court is to consider whether a request would be unduly burdensome in light

8   of the materiality shown.  *Mandel*, 914 F.2d at 1219.

9          As to the statistics regarding the arrests and events that occurred at the 1-19

10   checkpoint, the government has now provided those statistics to Morales-Armenta and the

11   Court.  These statistics are comparable to those used in *Soto-Camacho*.[12]  Morales-Armenta,

12   however, seeks additional statistics and the raw data.

13         The government cites to a number of cases which show that a checkpoint's

14   "effectiveness may be measured by the relationship of the checkpoint to its objective, rather

15   than by any measurable results, or by any results period[.]"  *United States v. Fraire*, 575 F.3d

16   929, 934 (9th Cir. 2009)  (internal quotation marks and citation omitted):

17         *United States v. Faulkner*, 450 F.3d 466, 473 (9th Cir. 2006) (discussing Supreme
         Court's approval of immigration checkpoints in Martinez-Fuerte notwithstanding that
18        only 0.12% of vehicles stopped were found to be transporting illegal aliens, and
         similar approval of sobriety checkpoints in *Michigan Department of State Police v.*
19        *Sitz*, 496 U.S. 444 (1990), notwithstanding that only 1.6% of drivers there were
         arrested for alcohol impairment); *see also United States v. Scott*, 450 F.3d 863, 869
20        (9th Cir. 2006) ("primary purpose" determined based solely on "programmatic
         purposes" of the checkpoint, not any subjective operational intent).

21   Response to Motion to Compel Disclosure (CR 16-121-TUC-CKJ, Doc. 44), p. 4.

22         However, Morales-Armenta points out that *Fraire* and *Faulkner* qualified the

23

24   _____

25         [12]Indeed, the Ninth Circuit has recently stated a defendant "should not have to rely solely
     on the government's word that further discovery is unnecessary." *United States v. Soto-Zuniga*,
26   837 F.3d 992 (9th Cir. 2016) (quoting *United States v. Budziak*, 697 F.3d 1105, 1113 (9th Cir.
     2012).  However, that court was discussing disclosure of checkpoint statistics, not the raw data.
27   Additionally, the Court notes the mandate has not yet issued in *Soto-Zuniga*.

28

1   discussion to "certain cases[,]" and distinguishes the cases as involving "park rangers talking

2   to drivers as they entered a national park where they would have had to stop anyway, and

3   where the stops served specific and articulated purposes relating to the welfare of the

4   parks[,]" which is not comparable to a checkpoint on a large freeway.  Reply to Motion to

5   Compel Disclosure (CR 16-121-TUC-CKJ, Doc. 45), p. 5.  Morales-Armenta also points out

6   *Soto-Camacho* considered results in determining the programmatic intent of the checkpoint

7   and the Supreme Court has recognized inquiry into the purpose of a checkpoint may be

8   appropriate:

> For this reason, we examine the available evidence to determine the primary purpose of the checkpoint program.  While we recognize the challenges inherent in a purpose inquiry, courts routinely engage in this enterprise in many areas of constitutional jurisprudence as a means of sifting abusive governmental conduct from that which is lawful.  Cf. 183 F.3d at 665.  As a result, a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar.  While reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs and administrative search cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue.

14  *City of Indianapolis v. Edmund*, 531 U.S. 32, 46-7 (2000).

16          The Court agrees with the defense that inquiry into the statistics may be appropriate

17  to determine programmatic intent of the I-19 checkpoint.  *Edmond*, 531 U.S. at 45

18  ("programmatic purposes may be relevant to the validity of Fourth Amendment intrusions

19  undertaken pursuant to a  general scheme without individualized suspicion").  However, this

20  agreement is only as to the checkpoint statistics, which have now been provided to Morales-

21  Armenta.  Morales-Armenta's assertion that he needs the additional statistics regarding

22  canine use or the raw data exceeds an inquiry into the constitutionality of the checkpoint.

23  Rather, it seeks to determine the viability of a specific tool (the canines) utilized by agents

24  at the checkpoint.  Morales-Armenta has not pointed to any authority that supports such an

25  inquiry (except as to the reliability of the canines).  Indeed, the inquiry at issue in *Edmund*

26  was whether a checkpoint whose primary purpose was to detect evidence of ordinary

27  criminal wrongdoing was constitutional.  In fact, to the extent *Edmund* addressed the use of

28  canines, it was to state, "[t]he fact that officers walk a narcotics-detection dog around the

exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search." *Edmond*, 531 U.S. at 40.  The defense's reliance on *Edmund* does not refute the constitutionality of dual purpose checkpoints that have been approved by the Ninth Circuit. *Soto-Camacho*, 53 F.3d at 412 (the immigration checkpoint was "not infected" by the fact that Border Patrol based the timing of the stop in part on drug intelligence").

The defense also asserts, in essence, that he does not trust CBP to accurately enter data regarding the events and arrests.  Therefore, the defense needs to review the raw data to confirm the statistics.  However, the system as described by Leonard does not allow any discretion in the data input.  The Court does not have any basis to conclude errors infected the data so as to make the statistics unreliable.

Where, as here, the statistics establish that a majority of the events and arrests at the I-19 checkpoint were immigration related, it is difficult to conclude that Morales-Armenta has presented facts which tend to show the government possesses additional information helpful to the defense.[13]  Indeed, the Ninth Circuit has stated that "where officers have broad discretion as to the parameters of the search, the addition of an impermissible motive extends the scope of the search, regardless of whether the items searched could have been subject to a valid administrative search." *United States v. Bulacan*, 156 F.3d 963, 970 (9th Cir. 1998), as amended (Nov. 16, 1998); *see also Hernandez*, 739 F.2d at 488 (for *Martinez-Fuerte* to apply, checkpoint need not operate all the time or be at a permanent structure; important factor is lack of discretion when operated).  Therefore, where agents have only limited discretion, an additional motive of using canines for not only human detection but also narcotic detection is not a material factor in determining whether a checkpoint is constitutional.  The testimony in this case establishes that, except for a few known local residents, the agents consistently follow the same procedure.

Furthermore, the Court cannot conclude additional statistics or the raw data is material

---

[13]This is not to say the Court would necessarily conclude materiality had been shown if statistics did not show a majority of the events and arrests were immigration related.

because the testimony did not establish the use of canines extended a stop at the I-19 checkpoint. Rather, the testimony established the canines initially alert to a vehicle prior to (pre-primary – while in line) or during the brief questioning during the initial stop (primary inspection) – this does not extend the brief stop allowed by *Martinez-Fuerte*. Indeed, the Ninth Circuit has stated:

> The lack of evidence supporting referral to secondary inspection is precisely what *Martinez-Fuerte* authorized. It would set that decision on its head to say that, while agents do not need articulable suspicion to refer for immigration-related inquiry, they must offer articulable suspicion of immigration-related offenses to demonstrate that they are not referring for another purpose.

*United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991). The court further stated:

> Had [defendants] offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, we would be required to address the applicability of the cases that deal with pretextual seizures to the type of stop authorized by *Martinez-Fuerte*. [Citations omitted.] But in the absence of that evidence, we need not reflect upon the applicability of *Martinez-Fuerte* to referrals where it appears that the referral is only (or even partially) for drugs. [Defendants] have offered no evidence why this was not a legitimate immigration stop. The agent at initial inspection offered evidence consistent with an immigration purpose.[4] Thus, *Martinez-Fuerte* controls. No articulable suspicion was required.
>
> [4]*See United States v. Watson*, 678 F.2d 765, 771 (9th Cir. 1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982):
>
> > We assume that the administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Barnett*, 935 F.2d at 181-82. Indeed, the Supreme Court has stated that the walking of a drug-sniffing canine around a vehicle during a traffic stop is permissible, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).[14] Without any basis to conclude the use of canines extends checkpoint stops, the requested discovery is not material.

Lastly, the Court considers the CBP's use of the canines. The canines are not trained

---

[14]Moreover, the Supreme Court has stated that an "alert by a reliable canine can provide probable cause." *Florida v. Harris*, 133 S.Ct. 1050, 1058-59 (2013); *see also United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993) (a "canine sniff alone can supply probable cause").

1  solely for human and narcotics detection.  They are also trained to detect other items,

2  including currency and firearms.  In other words, contrary to the implicit argument of

3  Morales-Armenta, the use of the canines is not simply to detect narcotics – the canines detect

4  humans, currency, and firearms along with narcotics.  This is a further indication that this

5  information is not material to an effort to establish the checkpoint or the use of canines is for

6  narcotics apprehension.

7

8  E.   *Possession, Custody or Control*

9       Fed.R.Crim.P. 16(a)(1)(E)(i) requires the government to disclose documents or data

10  within its possession, custody, or control.  "The rule does not require the government to

11  create documents [or data] that may provide information a defendant desires to obtain, nor

12  does it require the government to present agents or witnesses for interviews or in-court

13  examination." *United States v. Mahon*, No. CR09–0712–PHX–DGC, 2011 WL 5006737 at

14  *3 (D.Ariz. Oct. 20, 2011) (citing cases).  The rule "triggers the government's disclosure

15  obligation only with respect to documents within the federal government's actual possession,

16  custody or control." *United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985).

17       Although any inquiry into this issue may be appropriate in some cases, *Mandel*, 914

18  F.2d at 1219 (a court is to consider whether a request would be unduly burdensome in light

19  of the materiality shown), as the Court has determined the requested disclosure is not

20  material, the Court declines to address the partys' arguments regarding whether the requested

21  disclosure is in the possession, custody, or control of the government.

22

23  IV. *Requested Disclosure as to the Reliability of the Canines*

24       At the time of the briefing, the government had provided disclosure of canine training

25  records in CR 15-938-TUC-CKJ, but not in CR 16-121-TUC-CKJ.  During the hearing,

26  counsel informed the Court the documents at issue as to Jose Antonio Ruiz (CR 16-121-

27  TUC-CKJ) are also at issue as to Morales-Armenta (CR 15-938).  The parties dispute

28  whether this disclosure is sufficient.

The Supreme Court has stated:

> . . . The better measure of a dog's reliability thus comes away from the field, in controlled testing environments. [Footnote omitted.]

> For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. . . .

*Florida v. Harris*, — U.S. —, 133 S.Ct. 1050, 1057 (2013). When a defendant seeks discovery of a canine's history to potentially pursue a motion to suppress based on a canine's involvement in an investigation, the Ninth Circuit has stated the government must disclose a "'handler's log,' as well as 'training records and score sheets, certification records, and training standards and manuals' pertaining to the dog." *United States v. Thomas*, 726 F.3d 1086, 1096 (2013); *United States v. Cedano–Arellano*, 332 F.3d 568, 570-71 (9th Cir. 2003). Further, this Court is to determine whether a protective order or an in camera hearing is needed to accommodate law enforcement confidentiality concerns. *Id*. at 1098. Protective orders have been issued in both this case and in the companion case. (CR 15-938-TUC-CKJ, Doc. 39; CR 16-121-TUC-CKJ, Doc. 47).

However, a law enforcement privilege may protect information regarding law enforcement methods. *United States v. Rigmaiden*, 844 F.Supp.2d 982, 988 (D.Ariz. 2012) (citing *Roviaro v. United States*, 353 U.S. 53 (1957). The Supreme Court has stated:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest and protecting the flow of information against the individual's right to prepare his defense. Whether a proper

1    balance renders non-disclosure erroneous must depend on the particular circumstances
2    of each case, taking into consideration the crime charged, the possible defenses, the
     possible significance of the [evidence], and other relevant factors.

3    *Rovario*, 353 U.S. at 62.   Indeed, the Ninth Circuit has recognized disclosure is not

4    appropriate when it would disclose investigative techniques and procedures. *United States*

5    *v. DiCesare*, 765 F.2d 890 (9th Cir. 1985).

6        Morales-Armenta argues *Cedano-Arellano* is distinguishable from his case.  Because

7    *Cedano-Arellano* involved a search at the border rather than a checkpoint, Morales-Armenta

8    argues the issue regarding the scope and propriety of interior checkpoints was not presented

9    to the court.  For example, *Cedano-Arellano* dealt with reasonable suspicion to search a gas

10   tank after a canine alerted to it.  However, the same issue of reliability of the canines is at

11   issue in this case.  The surrounding facts do not affect what documentation sufficiently

12   establishes the reliability of a canine.  Morales-Armenta also argues *Cedano-Arellano* did

13   not limit disclosure to only those items discussed in that case.

14       The Court finds it appropriate to balance the public interest with protecting the flow

15   of information against the individual's right to prepare his defense.  As discussed in *Rovario*,

16   the Court will consider the particular circumstances of this case, taking into consideration the

17   crime charged, the possible defenses, the possible significance of the requested information,

18   and other relevant factors.

19       Markle testified as to the public interest in not fully disclosing the training manual.

20   Law enforcement is concerned full disclosure may permit reverse engineering, testing of

21   contraband and human concealment methods, or other attempts to defeat law enforcement

22   efforts by people who are smuggling people or contraband into the United States.  The

23   concern is not only as to what is contained in the documents, but that the knowledge that

24   comes with it cannot be forgotten or could be transferred to other areas of law enforcement.

25   Although the defense argues the protective orders will prevent the information from being

26   released, the Court understands the stated concern that the knowledge could inadvertently

27   be disclosed.  For example, while viewing a public canine demonstration, an innocent

28   comment regarding observations made of the physical conditions could be made without

even realizing the basis for the knowledge came from the protected material.

The Court also places significant weight on the concerns that the training techniques are similar to those used by other agencies and may be used for transference to other areas. In other words, it not simply the disclosure of the techniques for training canines to detect hidden humans, but that the techniques may also be used to train canines for more threatening items (e.g., chemical munitions) and that disclosure of the material in this case may affect law enforcement efforts as to other types of criminal investigations.

The Court balances these interests with consideration of the crimes charged, the possible defenses, the possible significance of the requested, and other relevant factors. Here, Morales-Armenta is charged with narcotic offenses.  Narcotics trafficking constitutes a danger to the community.  *See United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) (the harm to society caused by narcotics trafficking is encompassed within Congress' definition of "danger" as the term is used in § 3142(g)); *United States v. Ailemen*, 165 F.R.D. 571, 596 (N.D. Cal. 1996) (a drug trafficker is a danger to the community).  Moreover, as to the use of a canine at an immigration checkpoint, the Court recognizes  the "formidable law enforcement problems" posed by the northbound tide of illegal entrants into the United States. *Edmond*, 531 U.S. at 25 (quoting *Martinez-Fuente*, 428 U.S. at 551-54.

It appears success with his Motion to Suppress may be the strongest defense tactic available to Morales-Armenta.  However, the possible significance of the disclosure is not clear.  Dr. Myers stated that the current redacted status of the documents does not allow him to get enough information about the CBP detection canine training and certification program to develop opinions about whether it was appropriately developed or not or to advise defense counsel in a way that would help him prepare to cross-examine government witnesses on the subject.  Further, he has no way to determine the validity of the evaluation methodology (i.e., he can see the categories for evaluation, but not specific details).  However, Markle testified that, while the details are not provided, the redacted documents inform the defense that imprinting, training for searching and indicating is covered in the training.  He also stated that, even with the redactions, the reliability of a canine can be evaluated by examining the

1   entire program and processes, without going into the specifics.

2          Also relevant to the consideration is the history of the disclosure of these documents.

3   Markle testified that he was not aware that full disclosure of the CBP training documents has

4   ever been made.  Indeed, Dr. Myers did not testify that he had ever reviewed the CBP

5   training documents.  Moreover, Dr. Myers did testify that, although he had reviewed other

6   canine training materials, he has not reviewed FBI certification materials.  Based on the

7   testimony, it seems clear the CBP canine training manual would provide opportunities for

8   transference to other law enforcement training program such as the FBI canine training

9   program.

10         While the Court does not necessarily disagree with Dr. Myers's assertion that he

11   cannot completely evaluate the CBP training program without full disclosure, the Court finds

12   the public's interest in maintaining the confidentiality of the training records outweighs the

13   defense interests in full disclosure.  The categories in the training materials include

14   information as to the standards employed in training/evaluating the canine at issue in this

15   case.  These documents provide information as to the performance of the canine as to the

16   training and certification. The public's interest in non-disclosure of further unredacted

17   material outweighs the defense's interests in accessing this information to potentially

18   challenge the reliability of the canine.

19         The balance of the factors leads to a conclusion that the redactions of the canine

20   training materials is appropriate.  Markle testified regarding the concerns of the disclosing

21   the unredacted training materials.  Further, the declarations of Devaney address the law

22   enforcement concerns with disclosing unredacted material.[15]  Indeed, Devaney's September

23   8, 2016, declaration details precise concerns relating to the disclosure of specific exhibits.

24   The Court finds disclosure of the redacted material, as proposed by the government,

25   adequately balances the public interest with protecting the flow of information against the

26

27         [15]The declarations have been filed under seal.  The Court will not discuss the details

28   included within the declarations.

- 25 -

right to prepare a defense.  Additionally, the Court finds it appropriate to order an unredacted copy of the first slide of H-F.2 (within Ex. 49) of the canine records be disclosed.

Accordingly, IT IS ORDERED:

1.     As the Court has stated it will review the disclosure issues *de novo*, the following orders of the magistrate judge are VACATED:

    a.     The August 11, 2016 (Doc. 91) Order granting in part and denying in part the Request for Disclosure (Doc. 51) and the Motion to Compel Disclosure (Doc. 79).

    b.     The August 26, 2016 (Doc. 98) Order as to the disclosure of canine records.

2.     The government having provided the I-19 checkpoint statistics as discussed by *Soto-Camacho*, the government need not disclose additional statistics or raw data as to the I-19 checkpoint.   Therefore, as to checkpoint statistics discussed in the Request for Disclosure (Doc. 51) the Motion is GRANTED in part and DENIED in part.  The Motion to Compel Disclosure (Doc. 79) is GRANTED in part and DENIED in part.

3.     As to canine training materials discussed in the Request for Disclosure (Doc. 51) the Motion is GRANTED in part and DENIED in part.   The Motion to Compel Disclosure (Doc. 79) is GRANTED in part and DENIED in part.   The government shall provide a copy of the canine training materials to the defense with Exhibits 1-5, 15, 29, 31, and 32 and the first slide of H-F.2 (within Ex. 49) of the canine records submitted for *in camera* review unredacted.  The balance of the training materials may remain redacted as proposed by the government.  The Protective Order previously issued in this case shall apply to all disclosed canine records.

4.     The Motion for Review of Magistrate Judge's Order Requiring Proof of "Primary Purpose" of I-19 Checkpoint (Doc. 93) is DISMISSED AS MOOT.

5.     The Government's Appeal of Magistrate Judge's Order to Produce Documents to Defense (Doc. 107) is DISMISSED AS MOOT.

6.     The parties shall notify the Court by December 1, 2016:

     a.      Whether the parties prefer the hearing as to the Motion to Suppress be consolidated with the hearing as to the Motion to Suppress in CR 16-121-TUC-CKJ.

     b.      How much time is needed for the defense to review the disclosed materials; i.e., when a hearing on the Motion to Suppress should be set.

7.     Exhibits 1-4 shall be docketed with this Order.

DATED this 18th day of November, 2016.

_____
Cindy K. Jorgenson
United States District Judge



I-19 Checkpoint Activity with Technology
(Six Months Before)





EXHIBIT
**1** ADMITTED
CR 15-0938-TU



I-19 Checkpoint Activity
(Six Months After)



EXHIBIT
2   ADMITTED
CR 15·0938·TUC

## USBP Drug Seizures, Processed Subjects, and Conveyance Seizures at NGL's I-19 Checkpoint and Nearby Zones
### October 21, 2014 - October 21, 2015
*Arrest Data includes Deportable and Non-Deportable Subjects*
*Data Source: EID (Unofficial) as of End of Year Dates*

| | I-19 Checkpoint | | TCA Zones 38 and 47 | | TCA Zone 19 | | Nogales Station AOR | |
|---|---|---|---|---|---|---|---|---|
| | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 |
| Total Arrests | 242 | 290 | 1,053 | 1,118 | 481 | 491 | 7,379 | 7,882 |
| Total Events | 128 | 151 | 473 | 512 | 207 | 249 | 4,232 | 4,177 |
| Immigration Related* Arrests | 181 | 230 | 968 | 1,017 | 473 | 483 | 7,275 | 7,774 |
| Immigration Related* Events | 72 | 89 | 372 | 392 | 144 | 184 | 3,921 | 3,906 |
| Narcotics Related Arrests | 65 | 56 | 56 | 116 | 17 | 33 | 178 | 201 |
| Narcotics Related Non-USC Arrests | 18 | 16 | 38 | 66 | 17 | 33 | 116 | 147 |
| Narcotics Related Events | 55 | 47 | 95 | 101 | 70 | 70 | 350 | 294 |
| Narcotics Related Events with Non-USC | 15 | 12 | 31 | 41 | 15 | 13 | 85 | 87 |
| Other Arrests (All Non-immigration*) | 61 | 60 | 85 | 101 | 8 | 8 | 104 | 108 |
| Conveyance Seizures | 64 | 82 | 82 | 106 | | | 108 | 134 |
| Marijuana Pounds | 1,080.74 | 1,316.59 | 7,110.55 | 8,425.60 | 10,233.85 | 9,465.32 | 30,976.73 | 32,043.64 |
| Cocaine Pounds | 97.57 | 13.20 | 97.57 | 13.20 | | | 97.60 | 13.21 |
| Heroin Pounds | 67.01 | 4.02 | 67.01 | 4.02 | | | 67.03 | 4.02 |
| Methamphetamine Pounds | 82.40 | 31.25 | 82.40 | 31.26 | | | 85.44 | 34.15 |
| Ecstasy Pounds | | | | | | | | |
| Other Drug Pounds | 0.02 | 0.65 | 0.02 | 0.65 | | | 0.02 | 0.65 |
| Total Drug Pounds | 1,327.74 | 1,365.72 | 7,357.55 | 8,474.73 | 10,233.85 | 9,465.32 | 31,226.82 | 32,095.67 |
| FMUA Apprehensions | 4 | | 11 | 7 | 4 | 1 | 138 | 142 |
| Single Adult Apprehensions | 97 | 125 | 835 | 836 | 441 | 458 | 6,334 | 6,610 |
| UAC Apprehensions | 7 | 6 | 40 | 53 | 28 | 24 | 701 | 862 |
| Total Apprehensions | 108 | 131 | 886 | 896 | 473 | 483 | 7,173 | 7,614 |

*Immigration Related include events with at least one of the following criteria:
- Incident type of AAS or CAS
- Includes a deportable alien
- Includes a subject presented for prosecution on an 8 USC 1324 charge



EXHIBIT 3 ADMITTED CR15-0938-TUC

## USBP Drug Seizures, Processed Subjects, and Conveyance Seizures at NGL's I-19 Checkpoint and Nearby Zones

### June 15, 2015 - June 14, 2016

*Arrest Data includes Deportable and Non-Deportable Subjects*
*Data Source: EID (Unofficial) as of End of Year Dates*

| | I-19 Checkpoint | | TCA Zones 38 and 47 | | TCA Zone 19 | | Nogales Station AOR | |
|---|---|---|---|---|---|---|---|---|
| | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 |
| Total Arrests | 305 | 277 | 1,213 | 1,156 | 561 | 761 | 7,576 | 7,327 |
| Total Events | 163 | 155 | 576 | 518 | 279 | 370 | 3,946 | 4,109 |
| Immigration Related* Arrests | 240 | 217 | 1,110 | 1,061 | 545 | 745 | 7,448 | 7,209 |
| Immigration Related* Events | 97 | 87 | 447 | 404 | 208 | 275 | 3,658 | 3,799 |
| Narcotics Related Arrests | 58 | 63 | 115 | 136 | 27 | 22 | 210 | 212 |
| Narcotics Related Non-USC Arrests | 18 | 17 | 65 | 65 | 27 | 22 | 150 | 125 |
| Narcotics Related Events | 49 | 64 | 108 | 111 | 66 | 91 | 292 | 322 |
| Narcotics Related Events with Non-USC | 13 | 12 | 41 | 29 | 11 | 11 | 84 | 59 |
| Other Arrests (All Non-immigration*) | 65 | 60 | 103 | 95 | 16 | 16 | 128 | 118 |
| Conveyance Seizures | 79 | 70 | 100 | 95 | | 1 | 139 | 132 |
| Marijuana Pounds | 1,016.97 | 1,722.03 | 9,459.47 | 7,879.71 | 8,829.55 | 12,304.94 | 35,490.61 | 32,339.09 |
| Cocaine Pounds | 66.50 | 38.95 | 66.50 | 38.95 | | 0.00 | 66.50 | 69.04 |
| Heroin Pounds | 4.02 | 32.23 | 4.02 | 32.24 | | | 4.02 | 32.23 |
| Methamphetamine Pounds | 23.36 | 107.49 | 23.36 | 107.51 | | | 28.00 | 131.56 |
| Ecstasy Pounds | | | | | | | | |
| Other Drug Pounds | 0.65 | 59.58 | 0.65 | 59.58 | | | 0.65 | 61.99 |
| Total Drug Pounds | 1,111.50 | 1,960.28 | 9,554.00 | 8,117.99 | 8,829.55 | 12,304.94 | 35,589.78 | 32,633.91 |
| FMUA Apprehensions | | 1 | 9 | 8 | | 2 | 157 | 187 |
| Single Adult Apprehensions | 134 | 138 | 913 | 895 | 509 | 690 | 6,228 | 6,047 |
| UAC Apprehensions | 9 | 9 | 68 | 59 | 36 | 52 | 911 | 836 |
| Total Apprehensions | 143 | 148 | 990 | 962 | 545 | 744 | 7,296 | 7,070 |

*Immigration Related include events with at least one of the following criteria:
- Incident type of AAS or CAS
- Includes a deportable alien
- Includes a subject presented for prosecution on an 8 USC 1324 charge



EXHIBIT
4 ADMITTED
CR 15-938-TUC